UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

REFORM AMERICA d/b/a Created Equal,
and MARK HARRINGTON,

      Plaintiffs,

v.

CITY OF DETROIT, et al.

      Defendants.

Case No. 19-12728
Honorable Laurie J. Michelson

---

## OPINION AND ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT [20] AND GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [24]

Reform America, doing business as Created Equal, is a non-profit organization that advocates against abortion. A group of Created Equal members, led by its president Mark Harrington, came to Detroit in late July 2019 to demonstrate at the Democratic presidential candidate debate held at the Fox Theatre. Plaintiffs (hereinafter "Created Equal") were unable to demonstrate in their desired location because the City of Detroit had set up a restricted area around the Fox Theatre and denied them access. Created Equal tried to get closer to the Fox. At one point, they entered a privately-owned parking lot inside the restricted area. After Created Equal refused to leave the lot, Detroit police officers started to handcuff Harrington, but he was quickly released when he agreed to leave the restricted area. Finally, Created Equal moved to the "free speech area" set up in Grand Circus Park outside the restricted zone. When Created Equal tried to cross the street from one side of the park to the other, they were stopped by Detroit police officers and ordered to stay on the west side of the park.

Plaintiffs sued the City of Detroit and three individual Detroit police officers under 42 U.S.C. § 1983 for violation of their rights to free speech and equal protection, and for unlawful seizure. The parties filed cross-motions for summary judgment and both sides argue they prevail as a matter of law. Because the undisputed evidence shows that Defendants are entitled to judgment as a matter of law on all claims, their motion will be granted, and the case will be dismissed..

## I. Background

None of the key facts in this case are disputed.

Created Equal is a pro-life non-profit organization that advocates by displaying signs, handing out literature, and engaging in discussions with passersby in public spaces to spread its anti-abortion message. (ECF No. 1, PageID.3.) Created Equal also uses these same tactics to protest pro-choice politicians and political candidates. (*Id.*) On July 30 and 31, 2019, the Fox Theatre in downtown Detroit hosted debates for the Democratic presidential candidates televised by CNN. (*Id.* at PageID.5.) A group of Created Equal members traveled to Detroit with plans to protest outside the Fox Theatre to express opposition to the policies and positions of the candidates that Created Equal considered to be "pro-abortion." (*Id.*) The members carried signs with anti-abortion imagery along with literature they wanted to distribute. (*Id.* at PageID.8.)

The City of Detroit Police Department, in conjunction with CNN, Olympia Entertainment (the owner of the Fox Theatre), the United States Secret Service, the Department of Homeland Security, and the Michigan State Police, established a restricted area around the theatre due to security concerns. (ECF No. 24-2, PageID.336.) Indeed, many candidates were the subject of death threats. (*See* ECF No. 24, PageID.284; ECF Nos. 24-8, 24-9, 24-10.) The restricted area encompassed about eight square blocks and included both private property owned or controlled by Olympia and CNN, and public streets and sidewalks. (ECF No. 24, PageID.281; ECF No. 24-13.)

The restricted area is demarcated by the black semi-rectangular box, plus the area bounded by the red lines, in figure shown below.



Figure 1

Individuals with proper credentials could enter the restricted zone through one of several checkpoints manned by Detroit police officers. (ECF No. 24-2, PageID.340–341.) Those with credentials included members of the media, who set up in the parking lots owned or rented by Olympia. (*Id.* at PageID.379.) CNN set up a stage and a "candidate support corral" in one of the parking lots where a select number of supporters invited by the candidates could stand with signs and provide a backdrop for video footage. (*Id.* at PageID.406.) Although the restricted area was

swept for explosives prior to the event, those with credentials were not required to pass through a magnetometer or other physical screening before entering the restricted area. (ECF No. 1, PageID.9; ECF No. 24-2, PageID.340.) Police Commander Darin Szilagy was the tactical lead for security at the debate and the senior officer in charge of maintaining the perimeter of the restricted zone. (ECF No. 24-2, PageID.334, 337.)

Because demonstrators were not allowed inside the restricted area, the City also set up a designated protest area. Grand Circus Park, a public park directly outside the restricted area, was designated as the "free speech area." (*Id.* at PageID.347–348; ECF No. 24-13.) (Grand Circus Park at the bottom of Figure 1.) Demonstrators who tried to enter the restricted area were directed to Grand Circus Park or any other public sidewalks outside the restricted zone. (ECF No. 22; ECF No. 24-2, PageID.451.)

On July 30, Created Equal arrived at a drop-off location at the corner of Fisher Service Drive and Woodward Avenue around two hours before the debate was scheduled to begin. (*Id.* at PageID.8.) (This area appears in the top-left corner of Figure 1.) According to Created Equal, it was important for them to be in physical proximity to the Fox in part because the visual images on their signs were "an essential part of Plaintiffs' message." (*Id.* at PageID.6.) Created Equal tried to approach the Fox but were stopped at two different checkpoints by Detroit police officers, including J. Everitt and Kurt Worboys, who informed Created Equal they could not enter the restricted area and directed them to the protest area in Grand Circus Park. (*Id.*; ECF No. 22.)

Created Equal continued on, looking for a location "within aural and visual range of the Fox Theatre." (ECF No. 1, PageID.10.) They entered the parking lot of St. John's Episcopal Church (area bounded by red lines in top-center of Figure 1) and got as close to the Fox as they could without breaching what they thought was the perimeter of the restricted area along

Woodward Avenue. (*Id.*) Harrington then noticed the perimeter of the restricted area actually encompassed the parking lot, but that there were several news media outlets and a billboard truck running political ads for Bill DeBlasio in the lot. (*Id.*)

Officer Worboys, a Detroit Police Captain, again approached Created Equal and told them they could not stand in the parking lot because it was private property. (*Id.*; ECF No. 24, PageID.282; ECF No. 22.) Harrington objected. (ECF No. 1, PageID.11; ECF No. 22.) Commander Szilagy intervened and again asked Created Equal to leave the parking lot and go to one of the public areas. (*Id.*) Harrington again argued they should be allowed to stay. (ECF No. 1, PageID.12; ECF No. 22.) Szilagy directed the other officers to arrest Harrington. (*Id.*) One of the officers began to place Harrington's hands in flexible handcuffs, but quickly released him after he and his group agreed to exit the restricted area. (ECF No. 1, PageID.12–13; ECF No. 22.)

After exiting the parking lot, Created Equal proceeded to the designated free speech area in Grand Circus Park. (*Id.* at PageID.13.) The group briefly stopped in the east side of the park (which is "Free Speech Area 1" in Figure 1) before crossing Woodward Avenue to the west side of the park ("Free Speech Area 2"). (*Id.*; ECF No. 24-13.) For convenience, the relevant portion of Figure 1 is reproduced below:



According to Created Equal, they then realized that Area 1 was actually a more advantageous location because they believed it was more visible from the Fox Theatre and closer to the media, and attempted to return across the street. (ECF No. 1, PageID.14–15.) But as they

started to cross the street, they were stopped by Ronald Lach and other police officers. (*Id.*) Lach told them they could not join the protestors on the east side of the park because they "[did not] want any issues." (*Id.*; ECF No. 22 (Video 2).) Lach further explained that they "want[ed] both sides to be safe" and for "everyone [to] keep the peace." (ECF No. 24, PageID.290 (quoting ECF No. 22 (Video 2)).) Lach told Created Equal he was giving them a legal order to move from the street. (*Id.*) According to Created Equal, only speakers expressing Democratic-leaning views were allowed into the east side of the park, while those opposing the Democratic party were kept on the west side. (*Id.* at PageID.14–15.) Not wanting to be arrested, Created Equal complied with Lach's order and remained on the west side of the park. (*Id.* at PageID.15.)

Later in the day, Szilagy sensed the protestors in Grand Circus Park, which included everyone from the Proud Boys (often described as a "far-right" group) to By Any Means Necessary (often described as a "far-left" group), were becoming more agitated. (ECF No. 24-2, PageID.443–445.) Because the debate participants were all secured inside the theater, Szilagy and his colleagues decided to let the protestors march past the Fox Theatre in an effort to deescalate the tension and keep the peace. (*Id.* at PageID.443.) Szilagy also brought in additional police officers to line Woodward Avenue to keep the area secure. (*Id.* at PageID.455–456.) Szilagy allowed the protestors from the east side of the park, identified as the "left-leaning groups," to march first, followed by the right-leaning groups. (*Id.* at PageID.437–438; ECF No. 1, PageID.17.) Created Equal was included in the second group. (ECF No. 1, PageID.16.) They estimate the march lasted only about five minutes. (*Id.*) Shortly after the march, Created Equal departed the area because they were frustrated by the speech restrictions. (*Id.* at PageID.17.)

Created Equal returned to the area the next day for the second debate and proceeded directly to Grand Circus Park. (*Id.*) There were fewer protestors that day, so the group was able to

stand on the east side of the park for about 40 minutes without incident. (*Id.* at PageID.17–18.) But when a member of Created Equal began using a bullhorn, police officers approached and ordered them to stop. (*Id.* at PageID.18.) According to Created Equal, bullhorns had been permitted the day before. (*Id.*) Apparently the officers told Created Equal to either move to the west side of the park or "come with us." (*Id.*) Created Equal interpreted this as a threat of arrest, so they moved to the other side of the park and then left the area shortly after. (*Id.*)

Plaintiffs filed suit against the City and Officers Szilagy, Worboys, and Lach in September 2019, alleging claims under the First, Fourth, and Fourteenth Amendments. (ECF No. 1.) Plaintiffs and Defendants filed cross-motions for summary judgment and both argue that the case can be decided on the briefs as a matter of law.

## II. Legal Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. "A fact is material only if its resolution will affect the outcome of the lawsuit." *Hedrick v. Western Reserve Care Sys.*, 355 F.3d 444, 451–52 (6th Cir. 2004) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). And "a dispute about a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Scott v. First S. Nat'l Bank*, 936 F.3d 509, 516 (6th Cir. 2019) (internal citations omitted).

## III. Analysis

Plaintiffs bring three claims: (1) violation of the right to freedom of speech under the First Amendment, (2) deprivation of equal protection under the Fourteenth Amendment, and (3) unreasonable seizure under the Fourth Amendment. (ECF No. 1.) The Court will address each in turn.

## A. Freedom of Speech

Created Equal alleges that their right to freedom of speech was violated in multiple ways by Defendants during the group's two days in Detroit. First, Created Equal makes a general challenge to the constitutionality of the City's creation of a restricted area surrounding the Fox Theatre that prevented Created Equal from demonstrating in their desired location during the debates. Second, Created Equal alleges that Defendants' decision to separate protestors within the designated free speech area based on their viewpoint, thus denying Created Equal access to their preferred side of the park, unconstitutionally restricted their speech.

The same three-step framework applies to both of these free-speech claims. First, the Court must "decide whether the First Amendment protects the speech or expression at issue." *Satawa v. Macomb Cty. Rd. Comm'n*, 689 F.3d 506, 517 (6th Cir. 2012). Created Equal's conduct, namely holding anti-abortion signs and distributing literature, is clearly protected speech. *Hill v. Colo.*, 530 U.S. 703, 714–15, 710 n.7 (2000) (recognizing that "leafletting, sign displays, and oral communications are protected by the First Amendment.").

Second, the Court "fix[es] the appropriate level of scrutiny by specifying what kind of forum the speaker wants to use." *Satawa*, 689 F.3d at 517. To determine the level of scrutiny to apply to a free speech claim the Court must examine both the setting in which the speech occurs and whether the government regulation is based on the content of the speech.

When considering speech on public property, there are three types of forums: a traditional public forum, a designated public forum, and a nonforum. *See Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 46 (1983); *Satawa*, 689 F.3d at 517–18. Here, the government property at issue is streets, sidewalks, and parks, all of which "are quintessential public forums for free speech." *Hill v. Colorado*, 530 U.S. 703, 715 (2000) (internal quotation marks omitted).

When speech occurs in a traditional public forum, the level of scrutiny depends on whether the government's speech restrictions are content-neutral. Content- or viewpoint-based restrictions on protected speech are "deemed 'presumptively invalid.'" *Bible Believers v. Wayne Cty., Mich.*, 805 F.3d 228, 248 (6th Cir. 2015) (quoting *Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 358 (2009)). These types of restrictions are subject to strict scrutiny and can only survive if "the restriction is narrowly tailored to be the least-restrictive means available to serve a compelling government interest." *Id.* (citing *United States v. Playboy Entm't Grp.*, 529 U.S. 803, 813 (2000)). "By contrast, content-neutral regulation of the time, place, and manner of speech and associational activities conducted in a traditional public forum is evaluated with reference to the relaxed intermediate scrutiny standard." *Grider v. Abramson*, 180 F.3d 739, 748–49 (6th Cir. 1999) (internal quotation omitted). The government may impose a content-neutral time, place, or manner restriction if it is "narrowly tailored to serve a significant governmental interest" and "leave[s] open ample alternative channels" of communication. *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).

Once the level of scrutiny has been determined, the final step is to "determine whether the government's challenged action was constitutional, in light of the standards that apply to the relevant forum." *Satawa*, 689 F.3d at 517.

### 1. The Restricted Area

The Court first applies this law to Created Equal's challenge to the restricted area created outside the debate venue. Although the restricted area included a public street and sidewalks, traditional public fora, it also included some private property controlled by the hosts of the debate.

As a preliminary matter, the Court notes that First Amendment protections generally do not apply on private property. *See Lloyd Corp., Ltd. v. Tanner*, 407 U.S. 551, 568 (1972) ("[T]his

Court has never held that a trespasser or an uninvited guest may exercise general rights of free speech on property privately owned and used nondiscriminatorily for private purposes only."); *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 801 (1985) ("[A]s an initial matter a speaker must seek access to public property or to private property dedicated to public use to evoke First Amendment concerns."). In some very limited circumstances, a private setting may be transformed into a public forum when it is dedicated to public use, for example, where a company town "was performing the full spectrum of municipal powers and stood in the shoes of the State." *Lloyd*, 407 U.S. at 568–69 (citing *Marsh v. Alabama*, 326 U.S. 501, 503 (1946)). But property does not "lose its private character merely because the public is generally invited to use it for designated purposes." *Id.* at 569; *see also Manhattan Community Access Corporation v. Halleck*, 139 S. Ct. 1921, 1930 (2019) ("[M]erely hosting speech by others is not a traditional, exclusive public function and does not alone transform private entities into state actors subject to First Amendment constraints.").

Created Equal argues that the First Amendment can be implicated on private property when a municipality enforces speech restrictions imposed by a private entity. (ECF No. 32, PageID.884.) Created Equal relies on *Bays v. City of Fairborn*, 668 F.3d 814 (6th Cir. 2012), which held that public officials engaged in state action by "supporting and actively enforcing" a policy prohibiting solicitation at a festival. *Id.* at 819–20. But Created Equal misses a key fact. The festival in *Bays* was held at a public park. *Id.* at 817. So was the festival in *Parks v. City of Columbus*, 395 F.3d 643 (6th Cir. 2005), the principal case that *Bays* relies on. So in both of those cases, it was already established that the festival was a public forum and the only question was whether there was state action where the city granted a permit for the festival and the local police provided security. But these cases do not apply when an event is held on *private* property, which is not considered a forum

for First Amendment purposes, even if municipal police officers provide security for the event. *Cf.*

*Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442, 1450 (10th Cir. 1995) ("[A] number of

courts have held that the mere presence of police officers does not transform the conduct of private

parties into state action."). As *Lloyd v. Tanner* makes exceedingly clear, the First Amendment's

free speech protections do not extend to uninvited guests on private property.

With that issue resolved, the Court turns to the analysis of the restricted area imposed on

the traditional public fora of the street and sidewalks.

Created Equal argues that the restricted area was not content-neutral because a "candidate

support corral" was permitted inside the restricted area but a "candidate opposition corral" was

not. (ECF No. 20, PageID.147.) "The principal inquiry in determining content neutrality, in speech

cases generally and in time, place, or manner cases in particular, is whether the government has

adopted a regulation of speech because of disagreement with the message it conveys. . . . The

government's purpose is the controlling consideration." *Ward v. Rock Against Racism*, 491 U.S.

781, 791 (1989). In this case, the reason the City helped plan for and enforce the restricted zone

was to protect the presidential candidates and other attendees at the debate. Police stationed at

checkpoints were not "examin[ing] the content of the message" of those looking to enter the

restricted zone to determine whether to admit them. *McCullen v. Coakley*, 573 U.S. 464, 479

(2014) (internal quotations and citation omitted). The only criteria that the police officers used to

determine whether to allow an individual to enter the restricted zone was whether they had a ticket

to the debate or other proper credentials. The credentials that determined access were granted by

the event organizers, not the City. The City's purpose was in no way to exclude certain content or

viewpoints; it was to enforce the security arrangements developed by the security team.

The existence of the "candidate support corral" within the restricted zone does not change this conclusion. The candidate support corral was arranged by CNN and located on private property within the restricted zone. (ECF No. 24-2, PageID.406.) The City played no part in deciding who could be in the candidate support corral—the participants were, in fact, selected by the presidential candidates. (ECF No. 24-2, PageID.407.) The event organizers then created a list of names of those allowed in the corral to serve as a credential for those individuals to be admitted into the restricted area. (*Id.* at PageID.409.) The only role played by the police was to ensure that those credentialed to be in the corral did not wander into other parts of the restricted area where they were not allowed. (*Id.* at PageID.407–408.)

The City and the individual officers manning the checkpoints made decisions whether to allow someone into the restricted zone solely based on whether they had proper credentials and turned away equally all protestors without credentials. (ECF No. 24-2, PageID.449.) So the restricted zone is a content-neutral time, place, or manner restriction subject to intermediate scrutiny.

The first element of intermediate scrutiny is to determine whether the restriction is narrowly tailored to serve a significant governmental interest.

The caselaw makes clear that public safety and security are significant government interests. *See, e.g.*, *Schenck v. Pro-Choice Network Of W. New York*, 519 U.S. 357, 376 (1997) (holding that ensuring public safety and order is a significant governmental interest); *Grider v. Abramson*, 180 F.3d 739, 749 (6th Cir. 1999) (noting the "significant public interests in the maintenance of public safety, security, and order, including the physical protection of rally participants, spectators, passers-by, and law enforcement personnel" at a rally). Created Equal does not, and cannot, contest this general principle. But they argue that the government's security

interest was undermined by the fact that there was no specific credible threat associated with the debates and the restricted zone was too broad to serve this interest. It is true that "'mere speculation about danger' is not an adequate basis on which to justify a restriction of speech." *Saieg v. City of Dearborn*, 641 F.3d 727, 739 (6th Cir. 2011) (quoting *Bay Area Peace Navy v. United States*, 914 F.2d 1224, 1228 (9th Cir. 1990)).

But the circumstances surrounding this case are significantly different than the public festival in *Saieg* or the boat parade in *Bay Area Peace Navy*. The Democratic debates in Detroit featured 20 presidential candidates, many of whom were high-profile and controversial national figures. (*See* ECF No. 24-11.) Defendants provided news articles reporting that at least three of the candidates had been the targets of death threats and Created Equal does not meaningfully dispute this. (ECF No. 24, PageID.284; ECF Nos. 24-8, 24-9, 24-10.) More generally, the debates occurred during a time of extreme political polarization in this country. In addition to the concerns about terrorism that are present at any high-profile political event, the event organizers were concerned about violence between opposing groups of protestors. (ECF No. 24-2, PageID.447–448.) These concerns were informed by recent incidents at protests in Detroit and the violence at the Unite the Right rally in Charlottesville two years prior. (*Id.*) In light of these potential threats, the security plan, including the restricted area, were developed by a group which involved not only the City and Michigan State Police, but also the Secret Service and Homeland Security. (ECF No. 24-2, PageID.336.)

Created Equal argues that there was no credible threat to justify the imposed restrictions. But the government is permitted to craft restrictions relying on past experience and potential threats. *See Bl(a)ck Tea Soc'y v. City Of Bos.*, 378 F.3d 8, 13–14 (1st Cir. 2004) ("We do not believe a per se rule barring the government from using past experience to plan for future events

is consistent with the approach adopted in the Court's time-place-manner jurisprudence."); *Marcavage v. City of New York*, 689 F.3d 98, 105 (2d Cir. 2012) ("Because security protocols exist to deal with hypothetical risks"—and "security planning is necessarily concerned with managing potential risks, which sometimes necessitates consideration of the worst-case scenario—it is appropriate for governments to consider possible security threats and the role that protesters may play in causing such threats or inadvertently preventing the authorities from thwarting or responding to such threats." (internal quotations omitted)). In cases involving other high-profile political events, courts have repeatedly acknowledged that these types of events inherently create significant security concerns, even when there are no known specific threats. *See, e.g.*, *Citizens for Peace in Space v. City of Colo. Springs,* 477 F.3d 1212, 1223 (10th Cir. 2007) ("Here, the security zone directly advanced the City's interest in keeping explosives away from the NATO conference because it limited access near the [conference site] to identified and screened individuals who were less likely to pose any threat to the delegates."); *Bl(a)ck Tea Soc'y,* 378 F.3d 8, 12 (1st Cir. 2004) ("[T]here can be no doubting the substantial government interest in the maintenance of security at political conventions."); *Natl Council of Arab Americans v City of New York,* 331 F. Supp. 2d 258, 272 (S.D.N.Y. 2004) ("[T]his Court cannot blind itself to the daunting security concerns facing [New York City] during the [2004] Republican National Convention."); *Coal. to Protest Democratic Nat. Convention v. City of Bos.*, 327 F. Supp. 2d 61, 77 (D. Mass.), *aff'd sub nom. Bl(a)ck Tea Soc'y v. City Of Bos.*, 378 F.3d 8 (1st Cir. 2004) (reasoning in the context of the Democratic National Convention that "We have come to a point where it may be anticipated, at this and similar national security events, that some significant portion of the demonstrators, among those who want the closest proximity to delegates or participants, consider assault, even battery,

part of the arsenal of expression. And as a consequence, those responsible for event safety must plan for violence.").

The Court also rejects Created Equal's arguments that the City's interest in security was undermined by allowing protestors to briefly march past the Fox Theatre. (ECF No. 20, PageID.140.) Szilagy testified that the decision to allow the march was made to diffuse tensions between protestors. (ECF No. 24-2, PageID.442–443) The march happened after the candidates and attendees were already secured inside the theater. (*Id.* at PageID.443, 455.) And the police took additional precautions by requiring protestors to march on the far side of the street and bringing in more officers to monitor the march route. (*Id.* at PageID.437, 455.)

Created Equal also suggests in a footnote that their video exhibits show police allowing many pedestrians to walk through the restricted area. (ECF No. 29, PageID.803.) The Court has reviewed the videos and finds no evidence to support this contention. Commander Szilagy testified that the policy during the debate was only to allow into the restricted zone those with proper credentials. (*Id.* at PageID.449–450) Created Equal presents no evidence to suggest that the individuals walking inside the restricted zone in the videos had not already been screened and did not have proper credentials.

In sum, the Court finds that the City had a significant interest in ensuring the safety of the public and the presidential candidates during the debates.

So the Court must determine whether a restricted zone of eight square blocks around the Fox Theatre was narrowly tailored to serve that interest. "[T]he requirement of narrow tailoring is satisfied 'so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation.'" *Rock Against Racism*, 491 U.S. at 799. And although the restriction must not be substantially broader than necessary, "the regulation will not

be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative." *Id.* at 800.

It is clear that the restricted area outside of the Fox Theatre directly served the City's interest in maintaining public safety and security. The only question is whether the size of the restricted zone was reasonably tailored. The City argues that its "attempts to safeguard the public, and the participants and attendees of the debates, would have been achieved less effectively without the restricted zone, or with a smaller restricted zone." (ECF No. 24, PageID.299.) The Court agrees. The restricted zone was designed to extend one to one-and-a-half blocks from each side of the Fox Theatre. (ECF No. 24-13.) This is a relatively small area that is not substantially broader than necessary.

This conclusion is supported by the decisions of other courts that have considered the constitutionality of restricted areas outside of high-profile political events. In *Citizens for Peace in Space v. City of Colorado Springs*, the Tenth Circuit considered a security zone for a NATO defense conference which "extended across public and private property for several blocks in all directions." 477 F.3d 1212, 1217 (10th Cir. 2007). The court found the "security plan was narrowly tailored to advance its significant security interest because the security zone, limited to the immediate vicinity of the Broadmoor, directly and effectively protected the conference from the threat of terrorism, explosives, and violent protests." *Id.* at 1220. In relation to the 2004 Republican National Convention at Madison Square Garden in New York City, the Second Circuit held that a restricted zone confined to a two-block stretch and only in place during the convention was narrowly tailored to achieve the significant government interests of security and managing the flow of pedestrian traffic. *Marcavage v. City of New York*, 689 F.3d 98, 106 (2d Cir. 2012). *See also Menotti v. City of Seattle*, 409 F.3d 1113, 1133 (9th Cir. 2005) (holding that the restricted

zone outside the site of a WTO conference was narrowly tailored despite its large size because of the difficulty of protecting a group of world leaders); *Bl(a)ck Tea Soc'y v. City Of Bos.*, 378 F.3d 8, 14 (1st Cir. 2004) (upholding the district court's determination that a two-level security zone extending for several blocks outside of the 2004 Democratic National Convention was narrowly tailored).

The cases that Created Equal cites are not analogous. In *Bay Area Peace Navy v. United States*, the Ninth Circuit found there was no evidence of a security threat at the San Francisco naval parade and the Coast Guard, in prior years, had demonstrated ample ability to operate the event safely without a security zone. 914 F.2d 1224, 1227 (9th Cir. 1990). And although the court in *Service Employee International Union, Local 660 v. City of Los Angeles* found the secured zone outside the 2000 Democratic National Convention was not narrowly tailored, that is because the court concluded that the 185-acre zone "cover[ed] much more area than necessary." 114 F. Supp. 2d 966, 971 (C.D. Cal. 2000).

The Court concludes that the restricted area established by the City promoted a substantial government interest in safety and security that would have been achieved less effectively absent the regulation and thus the restriction was narrowly tailored. *See Rock Against Racism*, 491 U.S. at 799.

Finally, the Court must analyze the last element of intermediate scrutiny: whether the restricted zone left open ample alternative channels of communication. Created Equal argues that the free speech area in Grand Circus Park was an inadequate alternative because it did not allow them to reach their intended audience. (ECF No. 20, PageID.149.) The City counters that Created Equal had access to many reasonable alternative channels of communications, including demonstrating in the free speech area or anywhere outside the perimeter of the restricted area.

(ECF No. 24, PageID.299.) The City also notes that Created Equal could communicate their message to the candidates via radio, television, newspapers, social media, etc. (*Id.*)

Having access to adequate alternative channels of communication does not mean that Created Equal are entitled to the best or their favored means of communication. *Contributor v. City of Brentwood, Tenn.*, 726 F.3d 861, 865 (6th Cir. 2013) (internal citation omitted); *see also Marcavage v City of New York*, 689 F.3d 98, 107 (2d Cir. 2012) ("[T]he First Amendment does not guarantee protesters access to every or even the best channels or locations for their expression." (internal quotation marks and citation omitted)). In the Sixth Circuit, "[t]he key for purposes of the adequate-alternatives analysis is whether the proffered alternatives allow the speaker to reach its intended audience." *Contributor*, 726 F.3d at 865; *see also Saieg v. City of Dearborn*, 641 F.3d 727, 740 (6th Cir. 2011) (internal quotation omitted).

The intended audience of Created Equal was the presidential candidates and the attendees of the debates. (ECF No 20-2, PageID.161.) Created Equal does not meaningfully respond to the City's suggested alternative channels or explain why they would be inadequate, but instead simply reiterates that the free speech area did not allow their message to reach their intended audience.

The record evidence makes clear that Created Equal had adequate alternative means of communicating their message to attendees of the debate. All regular ticket-holding attendees entered the venue by passing through one of the checkpoints on the perimeter of the restricted zone. (ECF No. 24-2, PageID.340, 344.) Since demonstrators were permitted to stand anywhere outside of the restricted zone, not just the free speech area in Grand Circus Park, Created Equal could have positioned themselves directly outside the checkpoints so that every ticket-holder entering the restricted zone would have seen their signs and so that Created Equal could have

handed out literature. This option alone is a more-than-adequate alternative for reaching the debate attendees.

As for the presidential candidates, the Court acknowledges that Created Equal would not have been able to reach the candidates by standing outside the checkpoints. There is some debate whether Created Equal's position on the west side of Grand Circus Park could have been in view of the Fox Theatre and the candidates. (ECF No. 24, PageID.302; ECF No. 24-16.). But there are also several points along the restricted area perimeter that would have given Created Equal a more direct line of sight and sound to the Fox Theatre. For example, they could have stood on Witherell Street one block due east of the Fox Theatre entrance, with only a parking lot between them and the Fox. (*See* ECF No. 24-13.) Or they could have stood at the corner of Woodward Avenue and West Fisher Service Drive, even closer to the Fox Theatre entrance. (*Id.*) For convenience, the relevant portion of Figure 1 is again reproduced below:



Nothing in the Sixth Circuit jurisprudence suggests that an adequate alternative channel of communication requires that a plaintiff be within sight or sound of his desired audience. And several other courts of appeals have held that this is not a requirement. *See Marcavage v. City of New York*, 689 F.3d 98, 108 (2d Cir. 2012) (finding no caselaw to support a holding that sight and

sound access is constitutionally compelled); *Bl(a)ck Tea Soc'y v. City Of Bos.*, 378 F.3d 8, 14 (1st Cir. 2004) (rejecting the requirement of sight and sound access where "messages expressed beyond the first-hand sight and sound of the delegates nonetheless have a propensity to reach the delegates. . . .").

There is no First Amendment requirement that protestors be given direct access to high-profile figures. *See Bl(a)ck Tea*, 378 F.3d at 14 ("[A]lthough the opportunity to interact directly with the body of delegates by, say, moving among them and distributing literature, would doubtless have facilitated the demonstrators' ability to reach their intended audience, there is no constitutional requirement that demonstrators be granted that sort of particularized access."). And in the case of presidential candidates, several of whom had received death threats, security considerations are heightened, and alternative means of communication outside of person-to-person communication must be considered adequate. In addition to the vantage points within sight of the Fox Theatre where Created Equal could have displayed their signs and otherwise communicated their messages, Created Equal could have communicated their message to the candidates through a variety of other means. They participated in the march past the Fox Theater for this purpose. And all of the candidates for president certainly would have had tools in place for voters to communicate to them their opinions and priorities, for example, through their website, or perhaps a direct phone number to their campaign office. Of course, there is also social media, which in today's world is one of the most effective means for catching the attention of political candidates. As the First Circuit noted in the context of the Democratic National Convention, "[a]t a high-profile event, such as the Convention, messages expressed beyond the first-hand sight and sound of the delegates nonetheless have a propensity to reach the delegates through television, radio, the press, the internet, and other outlets." *Bl(a)ck Tea*, 378 F.3d at 14.

In light of all of these considerations, the Court holds that Created Equal had adequate alternative channels of communication to reach their intended audiences at the debates.

* * *

In sum, the City's restricted zone was a reasonable restriction on the time, place, and manner of Created Equal's speech because the restriction was content neutral, narrowly tailored to serve significant government interests, and left open adequate alternative channels for communication. *Ward v. Rock Against Racism*, 491 U.S. 781, 781 (1989).

## 2. Separation of Protestors

The Court next turns to Created Equal's claim that Defendants' decision to separate protestors of opposing views within the designated free speech area unconstitutionally restricted their speech by denying Created Equal access to their preferred side of the park.

The first question that must be addressed is what level of scrutiny to apply. Created Equal argues that strict scrutiny applies because protestors were denied access to certain parts of the free speech area based on their perceived political viewpoint. (ECF No. 20, PageID.149.) But again, when considering whether a restriction is content-based or content-neutral, "[t]he government's purpose is the controlling consideration." *Ward*, 491 U.S. at 791. "The principal inquiry . . . is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Id.* In this case, the police officers examined the content of each protest group's speech only to determine which side of the park they should stand on to best maintain safety and order. There is no evidence that the City or any individual officer was motivated by a disagreement with any protest group's viewpoint. The City's justification was therefore content-neutral because it "serve[d] purposes unrelated to the content of expression." *Id.* The Third Circuit reached the same conclusion when examining Philadelphia police officers' decision to relocate a

protestor "vocally condemn[ing] homosexuality" during the 2009 Equality Forum. *Marcavage v. City of Philadelphia, Pa.*, 481 F. App'x 742, 745 (3d Cir. 2012). The court reasoned that the City's decision to separate Marcavage's counter-protest from event participants was content-neutral because "[t]here is no evidence from any of the events that the City relocated Marcavage because it disagreed with the content of his speech. While the officers did necessarily consider the content of Marcavage's speech when deciding to impose restrictions on him that would separate his counter-protest from event participants, this does not make the restrictions content-based." *Id.* at 746. So the City's separation of protestors within the free speech area is another content-neutral time, place, or manner restriction subject to intermediate scrutiny. As stated above, the City may impose such a restriction if it is "narrowly tailored to serve a significant governmental interest" and "leave[s] open ample alternative channels" of communication. *Ward*, 491 U.S. at 791.

Maintaining public safety and order is a significant government interest. *Grider v. Abramson*, 180 F.3d 739, 749 (6th Cir. 1999); *see also Cutter v.* Wilkinson, 544 U.S. 709, 709 (2005) (noting that safety and security are "undisputedly compelling state interests."). So the essential question here is whether enforcing a separation between perceived right-wing and left-wing demonstrators was narrowly tailored to maintain safety and order.

To show that the restriction was narrowly tailored, Defendants must demonstrate that the restriction advances the government's interests "in a direct and material way." *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 487 (1995) (quotation omitted). The separation policy advanced the government's interest in safety and order "in a direct and material way" by preventing violence between hostile and potentially violent groups of protestors. A review of the key facts surrounding the separation helps to illustrate this point. Commander Szilagy testified that he had seen intelligence that some of the groups protesting at Grand Circus Park had a history of violence.

(ECF No. 24-2, PageID.349.) So the police asked groups that were left-leaning and right-leaning to each pick a side of the park and the groups self-sorted. (*Id.*) The police then helped guide new groups and individuals to the appropriate side. (*Id.*) According to Szilagy, this was consistent with the City's plan to maintain security at the event, as well as national best practices to keep opposing protests groups separate. (*Id.* at PageID.417, 448.) There was no violence amongst protestors at the debates, but Szilagy attributes this as a successful result of the separation policy. (*Id.* at PageID.417.) Created Equal's only response is that there was no violence or threat of violence between protestors to justify separating them. But as discussed above, a significant interest in safety and security does not require a specific credible threat. The City knew that certain protest groups in attendance had committed violence at other protests. And the protests were taking place in a highly trafficked public park outside of a polarizing political event. So the City's Police Department made the decision based on its own experience and national best practices to keep opposing groups separate within the free speech area.

The Court also finds that the separation of the protest groups left open ample channels of communication. Created Equal was able to exercise the full range of free expression, including holding signs, chanting, and speaking with passersby. They simply were restricted from doing so on one of the two equal sides of the park. Although Created Equal argues that the east side of the park where the left-leaning groups were standing was a more favorable position, it is not at all clear from the record that one side of the park was more favorable than the other. As Defendants point out, the west side of the park was actually closer to the Fox Theatre entrance. (ECF No. 24, PageID.311; ECF No. 24-13.) Any difference in the ability to communicate to debate attendees between the two sides of the park was immaterial. As the Court described above, there were several

vantage points available on the perimeter of the restricted area that were closer to the Fox Theatre than either side of Grand Circus Park.

Created Equal also mentions that they wished to interact with protestors from the left-leaning groups to attempt to influence their opinions on abortion and the separation policy prevented them from doing so. (ECF No. 20, PageID.149–150.) Although Created Equal members were not able to directly interact with those on the other side of the park, video footage shows they were able to display their signs within clear view of those on the east side of the park. (ECF No. 22.)

So the Court finds that the City's policy of separating protestors of opposing viewpoints was narrowly tailored because it directly and materially advanced the interests of maintaining safety and order amongst the protestors and the public and allowed ample channels of communication. Allowing protestors to freely and safely express themselves on opposite sides of the park appropriately balanced all of the protestors' free speech rights and the City's interest in safety and order. These interests would have been achieved less effectively absent the separation policy. *See Grider v. Abramson*, 180 F.3d 739, 750 (6th Cir. 1999) ("[A]ny resultant imposition [from the separation of KKK supporters and counter-protestors] upon their free association rights was trivial when juxtaposed against the compelling state interest in separating the two mutually antagonist[ic] and potentially hostile congregations."); *Braun v. Terry*, 148 F. Supp. 3d 793, 804–05 (E.D. Wis. 2015) (holding that re-locating 20 feet away rival and potentially hostile protestors was narrowly tailored to serve the compelling interests of safety and security and left open ample alternative channels of communication).

**B. Equal Protection**

Created Equal's second count is for violation of the Equal Protection Clause of the Fourteenth Amendment. "To state an equal protection claim, a plaintiff must adequately plead that the government treated the plaintiff disparately as compared to similarly situated persons and that such disparate treatment . . . burdens a fundamental right, targets a suspect class, or has no rational basis." *Bible Believers v. Wayne Cty., Mich.*, 805 F.3d 228, 256 (6th Cir. 2015) (internal citations and quotations omitted). First, the Court must determine if Created Equal was treated differently than similarly situated persons.

"In determining whether individuals are 'similarly situated,' a court should not demand exact correlation, but should instead seek relevant similarity." *Id.* (quoting *Bench Billboard Co. v. City of Cincinnati*, 675 F.3d 974, 987 (6th Cir. 2012)). Created Equal argues that they were treated differently in two contexts: (1) the City allowed a "candidate support corral" within the restricted area but not a "candidate opposition corral," and (2) the City allowed left-leaning groups to protest on the east side of Grand Circus Park but denied Created Equal access. (ECF No. 20, PageID.151.)

Taking first the candidate support corral issue, it is not clear that there is state action to support this claim. As discussed above, the corral was arranged by CNN and Olympia Entertainment and located on private property.

But even assuming there is state action because the City police officers allowed ticketed corral members into the restricted zone, but denied access to others, Created Equal cannot succeed on this claim because they are not similarly situated to the candidate support corral participants. The individuals in the candidate support corral were supporters selected by the presidential candidates. (ECF No. 24-2, PageID.406–407.) They were given credentials by the event organizers to enter the restricted zone and proceed to the corral located on private property. (*Id.* at

PageID.409) If they attempted to enter other parts of the restricted zone they were directed back to the corral by the police. (*Id.* at PageID.450.) Created Equal, on the other hand, had no credentials to enter the restricted area. Created Equal was treated equally to all other protest groups and individuals who attempted to enter the restricted area without credentials. Szilagy testified that the police officers blocked all persons who lacked credentials from entering the restricted zone and removed them if they breached the zone. (*Id.* at PageID.449–450.) As an example, members of the left-leaning group By Any Means Necessary breached the security zone multiple times and each time police officers ordered them to leave, threatening to arrest them if they did not, and they complied. (*Id.* at 449.)

Considering the separation of protest groups within Grand Circus Park, it can be argued that Created Equal were similarly situated to all other protest groups (of any political leaning). But, even if that is the case, there was no disparate treatment. As discussed above, the police decided to enforce the separation between left and right-leaning groups within the park in order to prevent violence and maintain public safety and order. (ECF No. 24-2, PageID.417, 448.) The groups began self-sorting themselves to opposite sides of the park and the police then directed new arrivals to the appropriate side and ensured that opposing groups did not cross the street onto the opposite side. (*Id.* at PageID.348–350.) This separation was imposed equally on all protestors— no matter their political leaning. And there is no evidence to support the notion that the east side of the park was a more favorable position for demonstrating. (ECF No. 24, PageID.311; ECF No. 24-13.) All protest groups in attendance, including Created Equal, were permitted to safely and freely express themselves in full view of passersby and the opposing groups on the other side of the park.

Because Defendants did not treat Created Equal differently than any similarly situated persons, Plaintiffs' equal protection claim fails.

## C. Unreasonable Seizure

Finally, Plaintiff Harrington claims that Defendants deprived him of his right to be free from unreasonable seizure under the Fourth Amendment.

To better appreciate this argument, recounting a few facts is helpful. Harrington and the other members of Created Equal entered the St. John's Episcopal Church parking lot, police officers approached the group, told them the parking lot was private property within the restricted area, and asked them to leave. (ECF No. 20-2, PageID.164; ECF No. 22; ECF No. 24-2, PageID.385.) The group refused multiple requests to leave the area. (ECF No. 20-2, PageID.164; ECF No. 22.) Szilagy arrived and informed the group that the Illitch Organization, who had a lease for the parking lot, had asked for Plaintiffs to be removed from the property. (ECF No. 24-2, PageID.386–388; ECF No. 22.) After Harrington again refused, the police officers briefly held Harrington's hands behind his back and began to slip flex cuffs around his wrists. (ECF No. 22.) After a few seconds, Harrington agreed to vacate the area, so the officers removed the zip ties and allowed the group to leave. (*Id.*)

There could be a colorable argument that no seizure actually occurred here since the video footage seems to show that Harrington was free to walk away from the encounter, and in fact he did exactly that. (ECF No. 22); *Florida v. Bostick*, 501 U.S. 429, 438 (1991) ("[I]n order to determine whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter."); *Michigan v. Chesternut*, 486 U.S. 567, 573–74 (1988)

(stating that an individual is seized if "a reasonable person would have believed that he was not free to leave."). But the City seems to concede that Harrington was briefly seized within the meaning of the Fourth Amendment. (ECF No. 24, PageID.312.) So the Court will assume without deciding that Harrington was seized. The City argues that the seizure was permissible because Harrington was trespassing and failed to obey a lawful order to leave the property. (*Id.*) Created Equal argues that the group members had not actually committed trespass since they had not been forbidden to enter the parking lot by the owner, occupant, or agent. (ECF No. 20, PageID.153.) So, in their view, the order to depart the parking lot was not lawful.

The parties focus their debate on the law of trespass and who can be an agent of a property owner, but resolving these questions is unnecessary. A seizure is lawful if the "facts and circumstances within the officer's knowledge [] are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Mich. v. DeFillippo*, 443 U.S. 31, 37 (1979). According to the undisputed testimony of Commander Szilagy, he was told during the security briefing for the debates that the St. John's parking lot had been leased by the Illitch Organization and CNN (ECF No. 24-2, PageID.388), and after Created Equal entered the parking lot on the day of the first debate he received a call from someone at the Illitch Organization asking him to remove the protestors from the lot (*id.* at PageID.387). So even if it Szilagy was ultimately mistaken about which organization had signed the lease, it was reasonable for him to believe that the protestors were trespassing on private property and that the lessee of that property had asked him to remove the protestors. Therefore, Szilagy and his officers reasonably believed Harrington and the other protestors were committing a crime and the brief seizure of Harrington was lawful.

**IV.**

For the foregoing reasons, the Court finds that Defendants are entitled to summary judgment on all of Plaintiffs' claims. Accordingly, Plaintiffs' motion for summary judgment (ECF No. 20) is DENIED and Defendants' motion for summary judgment (ECF No. 24) is GRANTED. The case is DISMISSED WITH PREJUDICE.

SO ORDERED.

Dated: June 1, 2021

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE